UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

                                              :
CLEVELAND HOUSING RENEWAL                      :
PROJECT                                        :
                                              :      CASE NO. 1:08-CV-3003
          Plaintiff,                           :
                                              :
vs.                                            :      OPINION & ORDER
                                              :      [Resolving Doc. Nos. 5, 11.]
DEUTSCHE BANK TRUST                            :
COMPANY, *et al.*                              :
                                              :
          Defendants.                          :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        Plaintiff Cleveland Housing Renewal Project ("CHRP") moves this Court to remand this

action to state court. [Doc 5-2.] Defendants Deutsche Bank Trust Company, Deutsche Bank National

Trust Company, Deutsche Fargo Bank National Trust Company, Deutsche Bank Trust Company

Americas (collectively, "Defendants") oppose. [Doc. 12-1.] CHRP named the City of Cleveland as

a Defendant in the state-court action.  Defendant City of Cleveland does not oppose remand.

        To resolve this motion for remand, this Court must decide whether the CHRP could have

brought this action in federal court.  28 U.S.C. § 1441(a).  CHRP says that it could not have brought

this action in federal court because (1) its claim fails to meet the constitutional Article III standing

requirements, U.S. CONST. art. III, § 2, cl.1, and the court-made prudential-standing requirements,

*see Am. Canoe Ass'n, Inc. v. city of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir.

Case No. 1:08-cv-3003
Gwin, J.

2004); and (2) its action does not satisfy the requirements for diversity-of-citizenship jurisdiction, 28 U.S.C. § 1332.  CHRP has additionally requested that this Court abstain from hearing this action because it involves an important matter of local public concern.  *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

To determine whether CHRP has standing, the Court must decide whether CHRP, as an organization, has suffered a sufficiently concrete injury-in-fact.  *See Am. Canoe*, 389 F.3d at 544. To determine whether this Court has diversity-of-citizenship jurisdiction, the Court must decide (1) whether the City of Cleveland's primary purpose in this litigation is aligned with CHRP such that the Court should realign the City as a Plaintiff; and (2) whether CHRP's action more likely than not states a claim for relief for more than $75,000.  To decide whether abstention is appropriate, this Court must balance the state and federal interests in these claims bearing in mind that "[t]his balance only rarely favors abstention."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996).

As will be explained below, this Court holds that CHRP has standing to bring this claim, that this claim satisfies the requirements for diversity-of-citizenship jurisdiction, but that abstention is appropriate.  Accordingly, this Court **REMANDS** this action to state court.

## I. Background Facts and Procedure

CHRP is an Ohio nonprofit corporation and its "principal corporate goal [is] the improvement and renewal of housing and economic conditions in the City of Cleveland." [Doc. 1-3 at 4.] CHRP sued the Deutsche Bank Defendants, which "hold[] title . . . to 25 . . . vacant properties . . . located in or near Cleveland." [Doc. 1-3 at 2-3.][1/]  CHRP also sued the City of Cleveland because it "may

---

[1/] The Defendants dispute this characterization of their interest in the 25 properties.  [*See* Doc. 12-1 at 2 n.1.] That dispute, however, has no bearing on this Court's resolution of the motion to remand.

Case No. 1:08-cv-3003
Gwin, J.

have or claim to have some interest" in the 25 properties. [Doc. 1-3 at 5.] In brining this suit, CHRP complained that Defendants activities threaten the progress and improvement of Cleveland area neighborhoods. [Doc. 1-3 at 3.]

In its Complaint, CHRP sought relief under Ohio Revised Code section 3767.41 ("Public Nuisance Statute") and under the common law of nuisance as outlined in *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1141-1143 (Ohio 2002) (holding plaintiff had stated a claim for common-law nuisance against gun-manufacturer defendants for "their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market").

In its statutory public nuisance claims, CHRP asked the state court to (1) declare 25 properties owned by Defendants in the Cleveland area a public nuisance as defined in O.R.C. section 3767.41(A)(2); (2) order Defendants to abate the nuisance or demolish the properties; and (3) enjoin the Defendants from conveying title of the properties. [Doc. 1-3 at 4.] CHRP said that the properties were "each in [a] post foreclosure death spiral: vacancy → boarded windows and doors → break-ins and vandalism → theft of the home's assets (copper, aluminum, iron) → haven for criminal activity decrease in neighborhood housing values." [Doc. 1-3 at 4.]

In its common-law public-nuisance claim, CHRP asked the state court to "declare as [p]ublic [n]uisance *the business practices*" of Defendants. [Doc. 1-3 at 6 (emphasis in original).] The thrust of this business-practices-as-nuisance claim is that (1) Defendants purchase foreclosed homes with (2) no intention to bring the foreclosed homes up to housing codes and (3) sell the homes before bringing the homes into compliance with housing codes. [Doc. 1-3 at 7-9.]

Defendants removed to this Court, saying that the Court had subject-matter jurisdiction based on diversity of citizenship.  [Doc. 1-1.]  Responding, CHRP said that, (1) it lacks both Article III and

Case No. 1:08-cv-3003
Gwin, J.

prudential standing to bring this action; (2) the Court lacks diversity jurisdiction because the City of

Cleveland is nondiverse and the amount in controversy is less than $75,000; and (3) the Court should

abstain from hearing the action because the case involves important and local state-law issues and

Ohio has expressed a preference to have this case heard in a specialized housing court.

In resolving this motion, this Court will first outline the legal standard governing adjudication

of removal and then address each of CHRP's three arguments in turn.  Because of CHRP's preference

for state court and the Defendants' preference for federal court, the parties are making unusual

arguments: CHRP, the plaintiff, is saying that it has not claimed a sufficient injury to satisfy the

standing requirements and the Defendants are saying that they have indeed caused a sufficient injury

to CHRP.

## II.  Motion to Remand

While CHRP is technically the moving party in the motion to remand, the "party seeking

removal bears the burden of establishing its right thereto."  *Her Majesty the Queen in Right of the*

*Province of Ontario v. City of Detroit*, 874 F.2d 332, 339 (6th Cir. 1989) (citations omitted).

Additionally, "[t]he removal petition is to be strictly construed, with all doubts resolved against

removal."  *Id.* (citations omitted).

A defendant bears this high burden because of concern for comity and fairness.  *See Shamrock*

*Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-109 (1941) ( "The power reserved to the states under

the Constitution to provide for the determination of controversies in their courts, may be restricted

only by the action of Congress in conformity to the Judiciary Articles of the Constitution.  Due regard

for the rightful independence of state governments, which should actuate federal courts, requires that

they scrupulously confine their own jurisdiction to the precise limits which the statute has defined.")

Case No. 1:08-cv-3003
Gwin, J.

(citations and internal quotation omitted); 14B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, WRIGHT & MILLER § 3721 (noting the risk of "exposing a state-court plaintiff whose case has been removed to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked a proper basis for removal jurisdiction requiring him to return to state court").

Under this standard, this Court now examines CHRP's three arguments for removal.

### III.  Standing Analysis

"It is black-letter law that standing requirements come in two flavors: first, . . . the irreducible Article III minimum of an injury in fact, fairly traceable to the conduct of the defendants, and redressible by a favorable judicial decision; and second, prudential requirements-i.e., self-imposed . . . limits on the federal judicial power." *Am. Canoe*, 389 F.3d at 544 (citations omitted).

Before addressing whether CHRP's action meets the Article III or prudential-standing requirements, this Court will first outline the basic principles that underlie these two sets of standing requirements.

*III.A.  Policy Considerations that Underlie Standing Requirement*

Standing requirements prevent courts from overstepping their constitutionally defined role and ensure the efficient functioning of the adversary system.

In addressing courts' proper constitutionally defined role, the Supreme Court has recently said that the Article III "case-or-controversy limitation is crucial in maintaining the tripartite allocation of power set forth in the Constitution." *DiamlerChrysler Corp. v. Charlotte Cuno*, 547 U.S. 332, 341 (2006) (citations and internal quotations omitted).  The Sixth Circuit has also recently explained that courts "must be silent in disputes best left to the political arena,"*Prime Media, Inc. v. City of*

Case No. 1:08-cv-3003
Gwin, J.

*Brentwood*, 485 F.3d 343, 354 (6th Cir. 2007) (citing *Luther v. Borden*, 48 U.S. (7 How.) 1, 12

L.Ed. 581 (1849)), and that courts "must turn away cases which would result in advisory opinions,"

*id.* (citing *Plaut v. Spendthrift Farm, Inc.* 514 U.S. 211 (1995)).

This case does not involve the separation-of-powers concerns the Supreme Court identified

in *Charlotte Cuno*. *See* 547 U.S. at 341. This is an action by a private actor seeking to hold another

private actor responsible for a public nuisance. This is not a case where a private actor asks this

Court to pass judgment on the action of another coequal branch of the government. *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (denying standing when private "organizations

dedicated to wildlife conservation . . . filed . . . action against the Secretary of Interior, seeking a

declaratory judgment that the [challenged] regulation [wa]s in error"). And, while this action is not

an entirely private dispute,  the determination of whether the 25 properties constitute a public

nuisance is not a question that is best left to the judgment of the legislative or executive branch. *Cf.*

*Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("The parties' dispute turns on the proper

construction of a congressional statute, a question eminently suitable to resolution in federal court.");

[Doc. 1-3 at 5 ("By this action the Plaintiff merely seeks the application of the established law of

Nuisance to the 25 properties owned by [Defendants].")]

Even if this case were a political dispute best left to other coequal branches of government,

this Court's remand, the remedy CHRP seeks, would not help to confine the judiciary to its proper

role. The judicial branch would still resolve this dispute–neither party denies that CHRP has standing

in state court.

In *Prime Media*, the Sixth Circuit also explained how the standing requirements ensure the

efficient function of the adversary system: "[A] false plaintiff could establish a poor precedent, either

-6-

Case No. 1:08-cv-3003
Gwin, J.

due to inadequate incentives to vigorously pursue the litigation, or inadequate factual development

due to the lack of any concrete injury.  Such a result might later prevent a truly injured plaintiff from

bringing her own truly meritorious lawsuit." 485 F.3d at 354.  Additionally, the standing

requirements help to "limit the amount of litigation" and provide  a "concrete factual setting" that

helps to "concentrate[] the judicial mind." *People Organized for Welfare and Employment Rights

(P.O.W.E.R.) v. Thompson*, 727 F.3d 167, 172-173 (7th Cir. 1984).

Here, CHRP appears to have adequate incentive to litigate and the case involves a concrete

factual setting.  The action covers 25 properties in a local and defined geographic area and  CHRP's

Complaint outlines the past practices that it seeks redress for.  Federal adjudication of this action does

not implicate the policy concerns that underlie the standing requirements.

Against this outline of the policies underlying both the Article III and prudential standing

requirements, this Court now decides whether CHRP has standing.

*III.B.   Article III Standing: Injury, Causation, and Redressability*

The Supreme Court has established a three-part test that is the "irreducible constitutional

minimum of standing, "*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992):

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has
> suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the
> challenged action of the defendants; and (3) it is likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-182 (2000) (citing

*Lujan*, 504 U.S. 560-561).  The standard of proof required to satisfy this test progresses along with

the in the case.  The party invoking federal jurisdiction must prove up each element of the three-part

test "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with

Case No. 1:08-cv-3003
Gwin, J.

the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  This case now stands at the pleading stage.

### III.B.1    *Injury in Fact*

Defendants assert that CHRP has standing as an organization. [Doc. 12-1 at 3-4 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).] Responding, CHRP says that it has not suffered an organizational injury and that its "concern about a problem is not enough" to satisfy the standing requirements. [Doc. 19 at 7-10 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739-740 (1972)).][2/]

To satisfy the constitutional injury-in-fact requirement, the injury need not be to an economic interest.  *See Havens Realty*, 455 U.S. at 379 n.20 ("That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not affect the nature of the injury suffered, *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977), and accordingly does not deprive the organization of standing.") Additionally, the severity of the injury does not affect the analysis so long as the injury is "specific and perceptible." *United States v. SCRAP*, 412 U.S. 669, 689, n.14 (1973) (noting that "'an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation'") (quoting Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613).

In *Havens Realty*, the Supreme Court has recognized that an organization that suffers a

---

[2/] CHRP directs this Court to a nearly identical Northern District of Ohio case where the court remanded the action to state court.  *See Cleveland Housing Renewal Project, Inc. v. Wells Fargo Bank, N.A.*, 1:08-cv-03001-AA (N.D. Ohio Jan. 29, 2009).  There, the court did not address organizational standing, and remanded the action because the defendant had "relied solely on CHRP's prior standing in state court without showing how CHRP has met the federal requirements of injury, causation, and redressability." *Id.* at *4.  The court then concluded that defendant had "failed to meet its burden of showing that CHRP ha[d] federal standing." *Id.*

Case No. 1:08-cv-3003
Gwin, J.

"perceptibl[e]" injury has standing to sue on its own behalf. 455 U.S. at 379.[3/] There, the plaintiff-

organization Housing Opportunities Made Equal ("HOME") sued the defendant-realtor Havens

Realty Corp. Id. at 366-67. HOME was a nonprofit corporation "whose purpose was 'to make equal

opportunity in housing a reality in the Richmond Metropolitan Area.'" Id. at 368. In suing Havens

Realty, HOME alleged that Havens Realty engaged in racial steering,

> a practice by which real estate brokers and agents preserve and encourage patterns
> of racial segregation in available housing by steering members of racial and ethic
> groups to buildings occupied primarily by members of such racial and ethnic groups
> and away from buildings and neighborhoods inhabited primarily by members of other
> races or groups.

Id. at 366 n.1. HOME alleged that this steering practice "had frustrated the organization's counseling

and referral services, with a consequent drain on resources." Id. at 369. The Supreme Court held

that HOME had standing as an organization:

> If, as broadly alleged, [Haven Realty's] steering practices have perceptibly impaired
> HOME's ability to provide counseling and referral services for low-and
> moderate-income homeseekers, *there can be no question that the organization has
> suffered injury in fact*. Such concrete and demonstrable injury to the organization's
> activities-with the consequent drain on the organization's resources-constitutes far
> more than simply a setback to the organization's abstract social interests, *see Sierra
> Club v. Morton*, 405 U.S. at 739. We therefore conclude . . . that in view of HOME's
> allegations of injury it was improper for the District Court to dismiss for lack of
> standing the claims of the organization in its own right.

Id. at 370 (emphasis added) (footnotes omitted).

The Sixth Circuit extended organizational standing in *American Canoe*, noting that,

"[u]nquestionably, an association may have standing to assert an injury to itself regardless of whether

its members also have standing." 389 F.3d at 544 (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

---

[3/] Standing to sue as an organization is a separate and distinct inquiry from the organization's ability to sue
on behalf of its members. *See* 13A WRIGHT & MILLER § 3531.9.5; *Sierra Club v. Morton*, 405 U.S. at 739.

-9-

Case No. 1:08-cv-3003
Gwin, J.

There, two environmental organizations sued several National Pollutant Discharge Elimination System ("NPDES") permit holders. *Id.* at 538-539. An NPDES permit allows the permit holder to release a limited level of pollutants into public waters. *See id.* The permit holders are statutorily required to "both to monitor their effluent discharges and report these results." *Id.* (citing 33 U.S.C. § 1318(a)). The plaintiff-environmental organizations alleged that the defendant-permit holders had failed to comply with reporting requirements. *Id.*

As to the injury-in-fact requirement, the plaintiff-environmental organizations asserted an "informational injury." *Id.* at 544. The plaintiffs said that they "suffered an injury in fact for Article III purposes" when they were denied the information required to be reported. *Id.* at 544. The court held that this lack of information "negatively affected" the plaintiffs because their

> daily operations [we]re stymied to the extent that they c[ould] no longer honor their own monitoring and reporting obligations to their members. Moreover, their ability to propose legislation and to bring litigation based upon the information collected by the defendants is clearly hampered. These activities are essential to their daily organizational activities and to fulfilling their institutional goals . . . .

*Id.* at 546.

A dissenting Judge argued that the case was distinguishable from *Havens Realty*. *Id.* at 549-550 (Kennedy, J., dissenting). In drawing a line between the two cases, the dissent said: "Although the interests alleged in *Haven* [sic] are similar to the interests alleged by American Canoe, the key differences remain that HOME encountered significant difficulty helping individual plaintiffs counteract discrimination directed at them *in a localized area*. HOME also incurred additional costs as a result of these racial steering practices." *Id.* at 550 (emphasis added).

Here, while CHRP denies any injury to itself as an organization, the Complaint supports a holding that CHRP suffered a cognizable injury similar to that in *Havens Realty*. In the Complaint,

Case No. 1:08-cv-3003
Gwin, J.

CHRP states that it "has as its principal corporate goal the improvement and renewal of housing and economic conditions in the City of Cleveland." [Doc. 1-3 at 4.]  CHRP's Articles of Incorporation say that CHRP's purpose is "to renew blighted conditions in neighborhoods by engaging in development activities, including but not limited to acquisition, assembly, rehabilitation, reutilzation, and management of real property and housing, and other related activities." [Doc. 19-4, Ex. C at 1 (emphasis removed).]  Additionally, like *Havens Realty*, this case involves only a localized area, as the dissent emphasized in *American Canoe*.

CHRP also says that it had helped to improve the neighborhoods of the 25 properties before Defendants began their practices:

> This action targets 25 [properties], located in or near Cleveland neighborhoods like the Slavic Village, Detroit-Shoreway, Buckeye-Woodland and Fairfax neighborhoods that – *with the help of the neighborhood organizations including Plaintiff – had been showing measurable improvement in renovating and marketing their housing stock, in providing safe streets and in improving their schools and infrastructure.  The progress these neighborhoods have realized is now being threatened by the activities of [Defendants]*.

[Doc. 1-3 at 3 (emphasis added).]  CHRP has "help[ed]" to "improve[]" these neighborhoods.  The record contains little evidence of what help CHRP has provided.  CHRP's articles of incorporation, however, suggest that it helps communities by "engag[ing] in development activities."  This help has been "threatened by the activities of the [Defendants]."

This action is also only at the pleading stage.  At the pleading stage, all that is required is "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing FED. R. CIV. P. 8(a)(2)).  "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (internal quotations and citations omitted); *Lujan*, 504 U.S.

-11-

Case No. 1:08-cv-3003
Gwin, J.

at 561 (noting that [a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice").

As in *Havens Realty*, "[i]f, as broadly alleged," Defendants' public nuisance "practices have perceptibly impaired" CHRP's ability to renew blighted conditions in neighborhoods, "there can be no question that the organization has suffered injury in fact." *See Havens Realty*, 455 U.S. at 379. The Court accepts, at this stage in the litigation, CHRP's contention that Defendants' business practices have threatened the progress of Cleveland neighborhoods and have caused these 25 properties to be in a "post foreclosure death spiral." [Doc. 1-3 at 4.]

### III.B.2.    Causation and Redressability

The parties spend little time addressing the remaining two requirements of causation and redressability. On causation, CHRP says in its Complaint that Defendants' actions "threaten[]" the progress made in the areas of the 25 properties. At this pleading stage, this Court accepts as true the allegation that the Defendants' business practices have caused damage to these Cleveland neighborhoods.

On redressability, if this Court accepts that Defendants' actions are damaging these Cleveland neighborhoods, an order from this Court preventing the Defendants' from continuing in this action would redress CHRP's organizational injury.

This Court holds that Defendants have made a sufficient showing to satisfy the Article III jurisdictional requirements. The Court now moves on to address the prudential-standing requirements.

### III.C.  Prudential Limitations on Standing

In saying that this Court lacks jurisdiction, CHRP references three prudential-standing

-12-

Case No. 1:08-cv-3003
Gwin, J.

requirements:

> (1) generally, a party may assert only his or her own rights and cannot raise the claims of third parties not before the court (2) a plaintiff may not sue as a taxpayer who shares a grievance in common with all other taxpayers; and (3) a party may only raise claims within the zone of interests protected by the federal statute in question.

[Doc. 19 at 3 (citations omitted).] CHRP's briefing on why these prudential limitations apply to this case is limited, which is problematic because of the complexity of the prudential-standing jurisprudence.  Nonetheless, none of these limitations prevent this Court from exercising jurisdiction here.

First, while it is true that generally a party cannot assert the rights of others, CHRP's Complaint alleges an injury to itself as an organization–this is not an assertion of the rights of others, but an assertion of its rights as an organization.  The standing requirements do not strip a court of jurisdiction simply because the relief a plaintiff seeks, such as abatement of a public nuisance, will provide some benefit to parties not before the court.

Second, while CHRP may share its grievance with many other taxpayers, CHRP does not share that grievance "equal[ly]" with all taxpayers.  *See Warth*, 422 U.S. at 499 ("[T]he Court has held that when the asserted harm is a generalized grievance shared in *substantially equal measure* by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.") (emphasis added) (citations omitted).  CHRP is an organization devoted to the improvement of the Cleveland housing market and not just a taxpaying citizen with a generalized concern.

Third, the main statute at issue here, the Public Nuisance Statute, O.R.C. § 3767.41, specifically grants groups like CHRP standing to sue in state court for a public nuisance.  O.R.C. § 3767.41(B)(1)(a) (allowing a "nonprofit corporation that is duly organized and has as one of its goals

-13-

Case No. 1:08-cv-3003
Gwin, J.

the improvement of housing condition in the county or municipal corporation in which the building

involved in located . . . may apply . . . for an injunction or other order").

These prudential-standing limitations do not suggest or require a holding that this Court lacks

jurisdiction here.

### IV.  Diversity Jurisdiction

Subject-matter jurisdiction under 28 U.S.C. § 1332 requires complete diversity and an amount

in controversy more than $75,000 exclusive of interest and costs.

*IV.A.   Complete Diversity*

CHRP named the City of Cleveland as a Defendant.  Both CHRP and the City of Cleveland

are residents of Ohio.  This common citizenship would normally prevent this Court from exercising

diversity jurisdiction.  But Defendants ask this Court to realign the City of Cleveland as a Plaintiff so

that the action would meet the requirement of complete diversity.

"Realignment . . . may create or destroy diversity jurisdiction."  *Safeco Ins. Co. v. City of*

*White House, Tenn.*, 36 F.3d 540, 545 (6th Cir. 1994) (citations omitted).  "Diversity jurisdiction

cannot be conferred upon federal courts by the parties' own determination of who are plaintiffs and

who are defendants."  *City of Indianapolis v. Chase Nat'l Bank of City of New York*, 314 U.S. 62,

69 (1941).  To determine the proper alignment of the parties, a court must ascertain the "principal

purpose of the suit, . . . and the primary and controlling matter in the dispute."  *Id.* (citations and

internal quotations omitted).

The Sixth Circuit has additionally held that, "parties be aligned in accordance with te primary

dispute in the controversy, even where a different, legitimate dispute between the parties supports

the original alignment."  *U. S. Fid. and Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1089 (6th

Case No. 1:08-cv-3003
Gwin, J.

Cir. 1992).  The court continued that, "despite the fact that there may be actual and substantial ancillary or secondary issues to the primary issue, the parties should be aligned in accordance with the primary issue in an action." *Id.*

In its Complaint, CHRP states that the City of Cleveland "*may have or claim to have* some interest in real property that is the subject of this action by virtue of code violations, utility assessments and Nuisance abatement costs." [Doc. 1-3 at 5 (emphasis added).] In briefing, CHRP states that the "ultimate purpose of this action is to abate the conditions creating a nuisance at the Properties, and complete relief requires action by the City and (therefore) the City's presence as an adverse party." [Doc. 5-2 at 7.] CHRP also says that the City of Cleveland is either an "inchoate lien holder or a lien holder of record" on the properties. [Doc. 5-2 at 7.] Responding to Defendants' request to realign the parties, CHRP says that the City may "risk conveying these properties without having satisfied the City's super-priority lien for unrecorded assessments," [Doc. 19 at 10,] and that the City action may be necessary to complete demolition of the 25 properties. [Doc. 5-2 at 8.]

The concerns CHRP has identified are "ancillary or secondary" to the ultimate purpose of the suit–to abate the conditions that create the nuisance.  The City's interests are aligned with CHRP. In answering the Complaint, the City asserted a Cross Claim against the Defendants saying that Defendants were responsible for the costs of abating the nuisance at several of the 25 properties and also responsible for the unpaid water costs at several of the properties. [Doc. 13.]

The Court **GRANTS** the Defendants motion to realign the City of Cleveland as a Plaintiff in this action. [Doc. 11.]  Accordingly, the action satisfies the requirement of complete diversity.[4]

---

[4] CHRP also says that removal was improper because the Defendants did not get the consent of the City because the City was nominally a Defendant in the state-court action. [Doc. 5-2 at 11.] Some courts have labeled this
(continued...)

Case No. 1:08-cv-3003
Gwin, J.

*IV.B.   Amount in Controversy*

CHRP says that the Defendants have not proved the amount in controversy because "[t]he right of the public to be free from [theft, vandalism prostitution, drug trafficking, and arson] cannot be measured in a monetary amount."  Additionally, CHRP says that, from its point of view, the abatement of the nuisance is not worth more than $75,000.

When a defendant removes an action where a plaintiff had sought to recover some "unspecified amount that is not self-evidently greater or less than the federal amount-in-controversy requirement," the Sixth Circuit has held that the removing defendant must show that the action "more likely than not" satisfies the $75,000 requirement. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 158 (6th Cir. 1993).  The "costs of complying with an injunction . . . may establish the amount in controversy." *Evertt v. Verizon Wireless, Inc.* 460 F.3d 818, 829 (6th Cir. 2006) (citations removed).

There is, however, some uncertainty on the method a court can use to calculate the amount-in-controversy.  "[H]ow to calculate that cost–whether from the perspective of the monetary value of the relief to the plaintiffs (which will generally be modest) or the monetary value of the relief to the defendants (which may be great in some cases)" is an unsettled issue of law.  *Id.*  The Sixth Circuit has recently noted the "circuit split as to whether a court may determine the amount in controversy from the perspective of either party (the 'either viewpoint rule') or whether a court may only consider the plaintiff's viewpoint." *Olden v. LaFarge Corp.*, 383 F.3d 495, 502 n.1 (6th Cir.

[4]/(...continued)

the "'Three Musketeers Rule'[:] multiple defendants must unambiguously and independently show that in seeking to remove a case from state court to federal court they are 'all for one, one for all.'" *Saylab v. Harford Mut. Ins. Co.*, 271 F. Supp. 2d 112, 117-118 (D.D.C. 2003) (quoting *Williams v. Howard Univ.*, 984 F. Supp. 27, 28 (D.D.C. 1997)). The Supreme Court, however, has held that "[f]or the purposes of removal, the federal law determines who is plaintiff and who is defendant." *Chicago, R.I. & P.R. Co. v. Stude*, 346 U.S. 574 (1954).  Accordingly, a federal court may realign the parties before ruling on removal, *see* 14C WRIGHT & MILLER § 3731, which allows a court to realign the parties before determining whether the proper consents were obtained, *Saylab*, 271 F. Supp. 2d at 117-118.

Case No. 1:08-cv-3003
Gwin, J.

2004).  The importance of the viewpoint is especially pronounced in "suits for an injunction or to

abate a nuisance."  14B WRIGHT & MILLER § 3703.[5/]  The Sixth Circuit has expressly declined to

decide this issue.  *Olden*, 383 F.3d at 502 n.1.  Besides declining to decide the issue, the *Olden* court

surveyed past Sixth Circuit decisions and noted that, "[i]n none of these cases . . . did the court either

consider the issue or express a subtle preference on way or the other."  *Id.*

> The arguments for the plaintiff-viewpoint rule and the either-viewpoint rule are as follows:
>
> The plaintiff-viewpoint rule can be justified in terms of the long-standing principle that the burden of establishing the subject matter jurisdiction of a federal court is on the plaintiff, and he or she must do so in the complaint, as is now required by Federal Rule of Civil Procedure 8(a)(3).  Testing the sufficiency of the amount in controversy from the perspective of the plaintiff's viewpoint is likely to produce greater certainty of result and promote simplicity in terms of deciding the jurisdictional amount question.
>
> . . .
>
> In some ways [the either-viewpoint rule] seems to be the desirable rule, since the purpose of a jurisdictional amount in controversy requirement—to keep trivial cases away from the federal court system—is satisfied when the case is worth a large sum of money to either party.

14B WRIGHT & MILLER § 3703.

When a removing defendant invokes federal jurisdiction, this Court will apply the either-

viewpoint rule.[6/]  The Defendants say that the amount-in-controversy requirement can be met here in

---

[5/] 14B WRIGHT & MILLER § 3703 ("In the majority of cases, the particular relief sought by the plaintiff—typically compensatory damages—will be exactly the same as the liability imposed on the defendant if the action is successful. It sometimes is the case, however, notably in suits for an injunction or to abate a nuisance or for other forms of specific relief, that the benefit of the action to the plaintiff will have a different value than the burden imposed on the defendant should relief be granted. Which value represents the amount in controversy for jurisdictional amount purposes?")

[6/] This Court expresses no opinion here on what rule to apply in the normal case where a plaintiff invokes federal jurisdiction.  An either-viewpoint-for-removal rule balances the policy considerations that underlie both rules. An either-viewpoint-for-removal rule (1) does little violence to the traditional pleading requirement that a plaintiff is
(continued...)

-17-

Case No. 1:08-cv-3003
Gwin, J.

several ways.  First, Defendants say the value of the properties at issue here "exceeds $1.3 million." [Doc. 12-1 at 12.] Second, CHRP asks this Court for an order imposing extensive limitations on the Defendants actions related to the subject matter of this litigation.  CHRP asks this Court order the Defendants (1) to identify and inventory all properties they own in the city, (2) to refrain from transferring the properties, (3) to abate the nuisance at the properties or to demolish the properties, and (4) to abate the nuisance of their business practices. [Doc. 1-3 at 4, 6-10.] These limitations would likely impose substantial costs on Defendants.

The monetary value of some aspects of the relief CHRP, such a reduction in crime in a neighborhood, may be difficult to calculate.  *See Goldsmith v. Sutherland*, 426 F.2d 1395, 1397 (6th Cir. 1970) (noting that "there is no exception to the [amount-in-controversy] requirement simply because the alleged damages . . . may be incapable of a monetary valuation).  This Court need not decide whether such damages could satisfy the amount-in-controversy requirement because other aspects of the relief satisfy the requirement.

According to Defendants, CHRP has stated that nuisance abatement of a property similar to the properties here had cost $100,000. [Doc. 12-1 at 12.] Additionally, CHRP seeks, if necessary, demolition of properties that the Defendants value at $1.3 million.  While Defendants' valuation is likely inflated, the Defendants would suffer losses if the Court ordered demolition. This action involves an amount in controversy over $75,000.[7]

---

[6] (...continued)
required to plead the jurisdictional amount and (2) will ensure that out-of-state defendants receive the benefits of diversity jurisdiction in non-trivial cases.

[7] Even if this Court were required to apply the plaintiff's-viewpoint rule, the amount in controversy would still exceed $75,000.  CHRP has alleged that this nuisance has caused substantial harm to neighborhoods in Cleveland. If this Court accepts CHRP's business-practices-as-nuisance claim, the Defendants have caused property values to
(continued...)

-18-

Case No. 1:08-cv-3003
Gwin, J.

## V.  Abstention

CHRP asks this Court to abstain from hearing this action because "this case belongs in the Cleveland Housing Court, the state court which has both the experience and the apparatus to address the myriad of problems presented by these local real estate challenges." [Doc. 19 at 13.] CHRP says that abstention is proper under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). As a preliminary issue, in asking for abstention, CHRP says that this Court should exercise its "permitted discretion" to abstain. [Doc. 5-2 at 12.] Abstention, however, is not a discretionary remedy and a court should only order abstention when the law requires it. *See Habich v. City of Dearborn*, 331 F.3d 524, 530 n.2 (6th Cir. 2003) (noting de novo review of *Burford* abstention); *cf. Cohens v. State of Virginia*, 6 Wheat. (19 U.S.) 264, 56 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

*Burford*-type abstention requires a federal court "to dismiss a case only in extraordinary circumstances," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726-727 (1996), and is justified by concerns for comity between federal and state governments.  The two leading Supreme Court cases on *Burford*-type abstention are *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*"), and *Quackenbush*, 517 U.S. 706.

In *NOPSI*, the Supreme Court held that a court should abstain when

timely and adequate state-court review is available and (1) a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial

---

⁷/(...continued)
decrease and have undercut the resources that CHRP has expended in brining this action.  This reduction in property values and waste of CHRP's resources would meet the amount-in-controversy requirement.

Case No. 1:08-cv-3003
Gwin, J.

public concern."

*Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660-61 (6th Cir. 2002) (quoting *NOPSI*, 491 U.S. at 361).[8/]

In *Quackenbush*, the Supreme Court said that, when determining whether abstention is proper, courts must

> balance[] the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of state law bearing on policy problems of substantial public import. This balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.

517 U.S. at 728 (citation and internal quotations omitted).

Reading *NOPSI* and *Quackenbush* together,[9/] they require Burford-type abstention where (1) timely and adequate state court review of the claim is available.  *Caudill*, 301 F.3d at 660.  If this review is available, a court must (2) identify the federal interest in adjudication of the class of case and the federal right in federal court.  *Quackenbush*, 517 U.S. at 728.  Then the court must (3) identify the state interest in the subject matter of the litigation.  *Id.*  If the subject matter of the litigation involves (a) "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (b) "state efforts to establish a coherent policy with respect to a matter of substantial public concern," and federal review

---

[8/] Although *NOPSI* only discussed the application of *Burford*-type abstention when federal adjudication will "interfere with the proceedings or orders of state administrative agencies," 491 U.S. at 362, the Sixth Circuit has rejected the argument that *Burford*-type abstention is limited to situations where state administrative agencies are involved.  *Caudill*, 301 F.3d at 661.

[9/] The Sixth Circuit has not conclusively established whether district courts should analyze abstention under the language in *NOPSI* or *Quackenbush*.  *See Caudill*, 301 F.3d at 660-61 (quoting the language from both decisions at length).  Accordingly, this Court will look at the language in both decisions.

-20-

Case No. 1:08-cv-3003
Gwin, J.

would disrupt these state efforts, *NOPSI*, 419 U.S. at 361, then the balance will favor the state interest and require federal-court abstention.

The Cleveland Housing Court provides for adequate and timely state court adjudication of this claim. This Court will now move to identification of the federal and state interests.

*V.A.*    *Federal Interests in Adjudication*

In identifying the federal interests implicated in a case, this Court examines the federal interest "in having certain classes of cases, and certain federal rights, adjudicated in federal court." *Quackenbush*, 517 U.S. at 778. In *Quackenbush*, the Supreme Court began the abstention analysis by noting that the federal interests were "pronounced" because the case involved the Federal Arbitration Act, which "implicate[d] a substantial federal concern for the enforcement of arbitration." *Id.* at 728-29.

Here, no federal right is implicated. Instead, diversity provides the only basis for jurisdiction. In reviewing the importance of diversity jurisdiction, the Sixth Circuit recognizes some federal interest in exercising Congressionally granted diversity jurisdiction: "there is a federal interest in having federal courts adjudicate all cases properly brought under a jurisdictional grant from Congress." *Miller v. Davis*, 507 F.2d 308, 317 (6th Cir. 1974). The *Miller* court noted that the "basic Congressional purpose" for diversity jurisdiction "was to protect out-of-state [litigants] from the prejudice of state courts." *Id.* at 316 (citing The Federalist No. 80 (Hamilton)).[10] Diversity jurisdiction also provides litigants with "procedures and remedies that were not available in the courts

---

[10] The continued viability of this justification has been questioned. *See* 13E WRIGHT & MILLER § 3601 ("Those who favor the retention of diversity jurisdiction contend that this prejudice still exists, although in a diminished form. But in a society infinitely more mobile and diverse than the one that existed at the time the Constitution was framed, it is difficult to believe that prejudice against a litigant based upon his or her being a citizen of a different state, is a significant factor.")

-21-

Case No. 1:08-cv-3003
Gwin, J.

of the several states." *Id.* (citations omitted).  The federal interest in diversity jurisdiction in *Miller* was "particularly strong" because the case involved a large "nationwide pension fund." *Id.* at 317. However, this case involves no similar national concern.

This action does not involve a nationwide subject matter.  Rather, the action is limited to an issue concerning land in a localized area.  Additionally, with this action, CHRP did not seek to vindicate any federal rights, nor did it seek relief based on any federal law.  The federal interest in *Quackenbush* was pronounced because of Congress's expressed interest through the Federal Arbitration Act. 517 U.S. at 729 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  The Complaint here did not implicate any federal right and jurisdiction is based solely on diversity-of-citizenship.  Although there is a federal interest here, the level of federal interest is at its nadir.

*V.B.*    *State Interests in the Subject Matter of the Litigation*

Courts determine the state interest in the subject matter of litigation by examining the state's legislative action addressing that subject matter.  In *Burford*, the plaintiff Sun Oil Company had sued the defendant Burford challenging the validity of a state administrative agency's grant of a permit to drill for oil.  319 U.S. at 318-319.  The Supreme Court noted that the suit involved the state's interests in preserving its natural resources and that this interest was a "very large one." *Id.* at 320. There the state had expressed its interest by establishing a regulatory commission to deal with this "thorny . . . problem" of oil and gas regulation and by vesting review of the commission's orders into a single set of state courts. *Id.* at 318, 325.

In *McDonald v. Village of Northport, Mich.*, 164 F.3d 964, 966 (6th Cir. 1999), a private-individual plaintiff sued several state and city officials asking the court redraw the land plat of their

-22-

Case No. 1:08-cv-3003
Gwin, J.

summer home to eliminate a public right of way.  In determining the state interest in this public right of way, the court examined the state's laws on the use of this land.  *Id.* at 967-69.

Here, the Ohio Legislature has expressed a strong state interest in the housing market in Cleveland.  Similar to *Burford*, Ohio has provided exclusive jurisdiction of claims under the Public Nuisance Statute to the specialized housing-division court. Ohio Revised Code section 1901.01 provides for the creation of a municipal court in Cleveland.  O.R.C. § 1901.01(A).  Section 1901.011 creates a "housing division in the Cleveland municipal court." O.R.C. § 1901.011.  Municipal courts generally only have original jurisdiction over those cases involving an amount less than $15,000, "except that this limit does not apply to the housing division . . . of a municipal court." O.R.C. § 1901.17.

Instead, a housing-division court has "exclusive jurisdiction" over an action within its territory under the Public Nuisance Statute, O.R.C. § 3767.41(B)(1), when the action "relates to a public nuisance." O.R.C. § 1901.181(A)(1).  Of all the municipal courts in Ohio, the state has housing divisions in only two: Cleveland and Toledo.  O.R.C. § 1901.011.  This suggests that Ohio legislature has specifically identified Cleveland as a local area that requires a specialized court.[11/]

Additionally, the Ohio Legislature has recently expressed a general interest in local resolution of problems in the Cleveland Housing market by passing Substitute Senate Bill 353 ("Land Reutilization Statute"). 2008 Ohio Laws File 135 (Sub. S.B. 353) (effective date April 7, 2009).  The

---

[11/] Outside of Cleveland, claims related to a public nuisance can be heard in courts of common pleas. *See e.g., City of Marion v. Real Property Located at 569 North State Street*, No. 9-03-28, 2003 WL 22765050 (Ohio App. Nov. 24, 2003) (affirming Marion County Court of Common Pleas finding that property "me[t] the definition of public nuisance as defined in [O.]R.C. [§] 3767.41(A)(2)").  A housing-division court would likely not have exclusive jurisdiction over CHRP's common-law business-practices-as-nuisance claim because the Public Nuisance Statute limits the definition of public nuisance to a "*building* that is a menace to the public health, welfare, or safety . . . ." O.R.C. § 3767.41(A)(2)(a) (emphasis added).

-23-

Case No. 1:08-cv-3003
Gwin, J.

bill authorizes any county having a population of more than 1.2 million (only Cuyahoga County) to establish a county land reutilization corporation.  Ohio Legislative Service Commission Report on Sub. S.B. 353 at 7, *available at* http://www.lsc.state.oh.us/analyses127/s0353-rh-127.pdf.  This corporation would be "created for the purposes of promoting development and managing and facilitating the reclamation, holding, rehabilitation, and reutilization of vacant, abandoned, or tax-foreclosed real property." *Id.*  In singling out Cuyahoga County as the only county permitted to create such a corporation, the Ohio Legislature recognized the special problems that Cuyahoga County faces and the need for local resolution of issues related to the Cleveland housing market.

To aid in the balancing of these interests, the Court now will examine whether this case involves either of the two types of cases identified in *NOPSI*.

### V.B.1.  Difficult, Important Issues of State Law and Policy

One circumstance where the Supreme Court has held that abstention is proper is when the case involves "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *NOPSI*, 419 U.S. at 361. CHRP's common-law business-practices-as-nuisance claim falls within this category.  CHRP asserted this cause of action following the recent Ohio Supreme Court decision *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1141-43 (Ohio 2002).  In *Beretta*, the Ohio Supreme Court reversed a court's dismissal under Ohio Civil Rule 12(b)(6) of a claim alleging that several gun manufacturers had "created and maintained a public nuisance by manufacturing, marketing, distributing, and selling firearms in ways that unreasonably interfere with the public health, welfare, and safety in Cincinnati." 768 N.E.2d at 1141.

Whether this theory of nuisance applies the business practices at issue here is a difficult and

-24-

Case No. 1:08-cv-3003
Gwin, J.

unsettled question of state law. This case nominally involves 25 properties, but an order from this Court declaring the Defendants' business practices a public nuisance would dramatically affect the operation of the Cleveland housing market and those nonparties that participate in this market. *Cf. Cleveland Hous. Renewal Project, Inc. v. Wells Fargo Bank, N.A.*, 1:08-cv-03011-AA (N.D. Ohio Jan. 29, 2009) (remanding similar action against Wells Fargo Bank to state court). Additionally, while this case only involves litigation between a private nonprofit corporation and a private bank, the case is of public concern by its very nature as an action for a public nuisance. Through legislative action, Ohio has shown that this public issue is important. This case falls within the first category of cases identified in *NOPSI*.

### V.B.2. Federal Disruption of State Efforts to Ensure Uniformity

A second category of cases identified by the Supreme Court are cases involving "state efforts to establish a coherent policy with respect to a matter of substantial public concern," and federal review would disrupt these state efforts. *NOPSI*, 419 U.S. at 361. As noted above, the Cleveland Housing Court would have exclusive jurisdiction within the state system over CHRP's public nuisance claim under the Public Nuisance Statute, O.R.C. § 3767.41. The state has express its interest in adjudication of these public nuisance claims in courts of special competence. *See Caudill, 301 F.3d at 660* ("The *[Burford]* Court emphasized that Texas law consolidated judicial review of commission orders in a single state district court, which allowed the courts to acquire specialized knowledge of the oil and gas regulations and industry.") (citing *Burford*, 319 U.S. at 325-326).

For this local issue of the Cleveland housing market, Ohio has required litigants to file these claims in a special housing-division court. Federal interference in this local matter may disrupt the state's efforts to have such cases uniformly adjudicated.

-25-

Case No. 1:08-cv-3003
Gwin, J.

This case involves both of the abstention appropriate situations identified in *NOPSI*. Additionally, a balancing of the respective federal and state interests suggests that this Court must abstain.  Based on a careful review of these interests, this Court holds that abstention is required.

### VI.  Conclusion

For the reasons stated above, this Court will abstain from hearing this action and will **REMAND** the action to state court.

IT IS SO ORDERED.


Dated: March 26, 2009                                  s/       *James S. Gwin*
                                                        JAMES S. GWIN
                                                        UNITED  STATES  DISTRICT  JUDGE